IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-02704-WJM-GPG

SHAWN SIGSTEDT,

       Plaintiff,

v.

COLORADO MOUNTAIN LOCAL COLLEGE DISTRICT;
COLORADO MOUNTAIN LOCAL COLLEGE DISTRICT BOARD OF TRUSTEES;
CARRIE HAUSER, as an individual;
MATT GIANNESCHI, in his individual capacity; and
DAVID GIFFORD, in his individual capacity,

       Defendants.

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

---

The Plaintiff, Shawn Sigstedt, by and through counsel, hereby responds as follows to the

Defendants' Motion for Summary Judgment (ECF No. 95):

**INTRODUCTION**

Shawn Sigstedt spent more than a decade teaching biology at Colorado Mountain College

(the "College"). Sigstedt enjoyed the work immensely, particularly sharing his passion for

science with the hundreds of students he taught over the years. In May 2020, the College

notified Sigstedt that it was non-renewing his employment because it thought he was

"incompetent"—i.e., not able to carry out the duties of a full-time professor. The deadline for

notifying professors of non-renewal, however, had passed more than two months before the

College got around to notifying Sigstedt. Sigstedt challenged the College's decision by

requesting a hearing before a peer review panel. The panel allowed Sigstedt less than an hour-

and-a-half to salvage his job, then excused the College's late notice of non-renewal (without

1

explaining why) and upheld the College administration's decision.  The College's President

swiftly announced her agreement with the panel and finalized Sigstedt's discharge.  Without any

further right of appeal, Sigstedt initiated the instant litigation, and the defendants now move for

summary judgment on his claims for breach of contract and violation of due process.  However,

because both claims involve material factual disputes that a jury will need to resolve, Sigstedt

respectfully requests that the Court deny the instant Motion for Summary Judgment ("Motion")

in its entirety.

## RESPONSE TO MOVANTS' MATERIAL FACTS

1. Admit.

2. Admit in part and deny in part.  Plaintiff admits that each year he was employed as a
regular faculty member, he and the College entered into an employment agreement.  However,
Plaintiff denies the insinuation that the College could choose to renew (or non-renew) his
employment for any reason because once he attained status as a regular faculty member, Sigstedt
secured job protections insofar as his employment could only be terminated for the reasons set
forth in Board of Trustees Policy 6.26—i.e., non-renewal or dismissal.  Exh. 1 (Policy 6.26.)

3. Admit.

4. Admit.

5. Admit.

6. Admit.

7. Admit.

2

8. Admit.

9. Admit in part and deny in part. Plaintiff admits that the College accurately recites the four areas outlined in his performance plan but denies the assertion that those areas related to his "competence" as that term was defined by Board Policy 6.26. *See* Exh. 1. Rather, the four areas included in the performance plan related to Sigstedt's level of teaching proficiency, not his "ability to perform" the teaching duties assigned by the College. *Id.* Plaintiff further admits that Canvas is the College's learning management system but denies that the four areas outlined in the performance plan were unevenly weighted. *See* Exh. 2 (Performance Plan).

10. Admit.

11. Admit.

12. Admit.

13. Admit.

14. Admit in part and deny in part. Plaintiff admits that he signed the performance plan but denies that he agreed with the plan. Exh. 3 (Sigstedt Depo. Tr.), p. 134:1-21. Plaintiff also denies that successful completion of his performance plan was listed as a term of his employment for the 2019-20 academic year. Exh. 4 (2019-20 Employment Contract).

15. Admit in part and deny in part. Plaintiff admits that, initially, the performance plan set a deadline of September 4, 2019 for submission of materials. However, Plaintiff denies that he "failed" to meet that deadline; rather, the College changed the deadline on September 4, 2019,

3

when Dave Gifford emailed Sigstedt a timeline that was meant to keep everyone on track with regard to how the performance plan would unfold. Exh. 3, p. 147:6-24.

16. Admit.

17. Admit in part and deny in part. Plaintiff denies the insinuation that he failed to submit course materials on time—the College changed the deadline for him to submit materials. Exh. 3, p. 147:6-24. Plaintiff admits that he submitted student statements to Gifford, that Gifford reviewed them, and that Gifford viewed the students' statements as evidence that Plaintiff diverged from required learning outcomes. However, Plaintiff denies that he diverged from required learning outcomes. *Id.* at 134:1-21.

18. Admit in part and deny in part. Plaintiff admits that Gifford and Loes observed his BIO 111 class in October 2019. Plaintiff denies that the class lacked structure, that he struggled with subject matter, and that he extensively discussed material unrelated to general college biology. *See* Exh. 3, p. 168:1-15.

19. Admit in part and deny in part. Plaintiff admits that Loes and Gifford observed him using an instructional technique known as "Interesting Concepts," but denies that it is highly questionable or an otherwise inappropriate method for generating class discussion. Exh. 3, pp. 195:14 – 196:23. In Sigstedt's experience, using "Interesting Concepts" as an instructional technique enlivened the subject matter by helping students see the current relevance of the topics they were learning about in class. *Id.*

20. Admit.

4

21. Deny.  Lawrence told Plaintiff that he thought Plaintiff "might be fired" if he did not put his professor directed labs in writing.  Exh. A to Motion, p. 158:14-19.  To Plaintiff, that seemed impossible because his professor-directed labs were constantly evolving due to ongoing developments in science, so he set about uploading stock labs that accompanied the course textbook.  *Id.* at 158:14 – 159:4.

22. Admit in part and deny in part.  Plaintiff admits that Lawrence observed his class and emailed him a few weeks later with feedback.  Plaintiff denies that he provided inaccurate information, discussed irrelevant material, and that his use of ICs was ineffective and inefficient.  Exh. 3, pp. 195:2-5 and 14-25; 196:1-23.

23. Admit.

24. Admit in part and deny in part.  Plaintiff admits that Dean Massey sent an email asserting that his students were behind but denies the truth of that assertion.  Massey changed Plaintiff's course syllabus to cover topics Massey preferred to teach, but which Plaintiff had not yet covered.  Exh. A to Motion, p. 203:12-21.

25. Admit.

26. Admit.

27. Admit.

28. Admit.

29. Admit.

5

30. Admit.

31. Deny.  Plaintiff submitted the topics of his lectures, and his attempts to upload content related to those topics were frustrated by problems he encountered with the Canvas system.  Exh. A to Motion, p. 228:1-8.

32. Deny.  Plaintiff uploaded the lab manual, which he understood would convey to the College that he intended to teach the labs therein contained.  Exh. A to Motion, p. 7-17.

33. Admit.

34. Admit.

35. Admit in part and deny in part.  Plaintiff admits that three professors reviewed the materials in his Canvas shells and that they agreed with Gifford's determination.  Plaintiff denies that the professors' input validated Gifford's conclusion.  Exh. 3, pp. 232:11 – 233:25.  For example, Plaintiff tried to show Gifford and the reviewing faculty what content he intended to teach by uploading course syllabi to Canvas; he was unable to upload more detailed lecture content because he experienced technical troubles with the Canvas system, but to Sigstedt, trouble uploading documents in no way indicated that he lacked the ability to teach or perform his other responsibilities at the College.  *See id.*

36. Admit.

37. Admit.

38. Admit in part and deny in part. Plaintiff admits that Policy 6.26 provided grounds for dismissing a professor from employment but denies there were sufficient grounds to dismiss him from employment. *E.g.,* Exh. 3, pp. 135:15-20; 261:22 – 262:9 (describing information submitted to peer review panel to rebut College's evidence of incompetence); 267:2-3 and 10-11 (summarizing President's decision and Sigstedt's reaction).

39. Admit.

40. Admit.

41. Admit.

42. Admit.

43. Admit in part and deny in part. Plaintiff admits that Gifford submitted materials to the peer review panel, but denies the materials supported his determination that Plaintiff failed to meet the expectations set forth in the performance plan. Exh. 3, pp. 261:22 – 262:9.

44. Admit in part and deny in part. Plaintiff admits that the peer review panel convened a virtual hearing, and that both parties were accompanied by counsel. Plaintiff denies that he was given an opportunity to cross-examine the College or ask questions of Gianneschi, Gifford, or any other witness. *See* Exh. 5 (Procedure 6-I); Am. Compl. (ECF No. 17) ¶¶39.C and 40; *see also* Answer (ECF No. 17), ¶¶39-40.

45. Admit.

46. Admit.

47. Admit.

48. Admit in part and deny in part.  Plaintiff admits that the peer review committee deliberated after the virtual hearing but denies that the committee assessed his "competence" as that term is defined by Board of Trustees policy.  The committee's written recommendation was silent regarding several factors that Policy 6.26 lists as mandatory considerations in weighing a professor's competence.  Exh. 6 (Peer Review Panel Recommendation); Exh. 1.

49. Admit in part and deny in part.  Plaintiff admits that the peer review committee reached the conclusions listed in paragraph 49 of the Defendants' Motion but denies that the committee fully assessed his competence under Policy 6.26.  *See* Exhs. 1 (providing criteria for assessing competence and 6 (Peer Review Committee's decision).  Rather, the committee considered whether Plaintiff had successfully followed the College's instructions for completing his performance plan by, for example, uploading documents into various Canvas folders.  Exh. 6.

50. Admit in part and deny in part.  Plaintiff admits that the peer review committee decided additional hearing time was unnecessary.  Plaintiff denies that the evidence supporting non-renewal was overwhelming and that none of the evidence he submitted addressed his so-called failure to complete the performance plan.  In submitting evidence to the committee—e.g., exams and students' reflections about what they learned in his courses—Plaintiff demonstrated to the committee that he was able to carry out the duties of a professor at the College, even if he struggled to overcome the technical challenges he faced when trying to meet his deadline to submit materials.  Exh. 3, pp. 261:22 – 262:9.

51. Admit in part and deny in part. Plaintiff admits that the peer review committee sent its recommendation to the College president but denies that the committee properly assessed his competence. As noted previously, the committee failed to consider several mandatory factors in weighing Plaintiff's competence, and Plaintiff was not even assigned teaching responsibilities during the period he was supposed to be improving his teaching ability. Exh. 6; Exh. 3, p. 201:4-15.

52. Admit.

53. Admit.

54. Deny. Plaintiff testified at his deposition that he has looked for jobs, but the inquiries he made required positive referrals from an applicant's most recent employer, which for him would have been the College. Exh. A to Motion, p. 277:3-7. When pressed about whether he has applied for any jobs since being non-renewed by the College, Plaintiff testified that he has not. *Id.* at 277:8-12.

**STATEMENT OF ADDITIONAL FACTS WHICH ARE, OR REASONABLY SHOULD BE, UNDISPUTED**

A. Sigstedt's 2019-20 employment contract incorporated by reference Board of Trustees Policy 6.26. Exh. 4, p. 3.

B. Policy 6.26 required the College to notify Sigstedt of non-renewal no later than 60 days before the end of his contract term. Exh. 1, p. 2.

C. The College <u>did not</u> notify Sigstedt of non-renewal 60 or more days before the end of his contract term. Exh. 7 (Notice of Non-renewal).

D. Under Policy 6.26, non-renewal and dismissal are separate ways for the College to terminate a professor's employment. Exh. 1.

9

E.  The College considered whether to "dismiss" Sigstedt, but it chose not to.  Exh. 8 (Gianneschi Depo. Tr.), pp. 49:15 – 50:19.  Instead, the College decided to "non-renew" Sigstedt, and it informed him of that fact and of his right to appeal the College's decision on May 19, 2020.  *Id.*; Exh. 7.

## ARGUMENT

### I.    Standard of Decision

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute "is genuine 'if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.'" *J.V.*, 813 F.3d at 1295 (quoting *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013)). A dispute "is material 'if under the substantive law it is essential to the proper disposition of the claim.'" *Id.* (quoting *Becker*, 709 F.3d at 1022).  In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and must resolve all factual disputes and draw all reasonable inferences in his favor.  *Bilder v. Mathers*, 756 F. App'x 802, 806 (10th Cir. 2018).

### II.    Breach of Contract

There is no question that the College missed its deadline for notifying Sigstedt of non-renewal by more than two months.  There is a material factual dispute, however, regarding the College's assertion that it performed its contractual obligations while Sigstedt failed to perform his.  Consequently, it would be inappropriate to award summary judgment to the College on Sigstedt's breach of contract claim.

### A.  Whether Sigstedt Performed Under the Contract is a Disputed Question of Fact

10

In Colorado, a party seeking to recover on a claim for breach of contract must prove: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992). In a breach of contract action, the "performance" element means "substantial performance." *Id.*

Substantial performance means the party attempted in good faith to fully perform, and any deviation from the contract terms did not materially detract from the benefits the other party would have received through strict performance. *Newcomb v. Schaeffler*, 279 P.2d 409, 412 (Colo. 1955). Whether performance is substantial is a question of fact. *Rohauer v. Little*, 736 P.2d 403, 410 (Colo. 1987).

Here, the College argues that Sigstedt failed to perform his contractual obligations by "fail[ing] to complete the Revised Performance Plan [which] constituted deficient performance of his contractual duties[.]" ECF No. 95, p. 18. However, Sigstedt testified during his deposition in this case about his good faith effort to successfully complete the performance plan. For example, Sigstedt: emailed Gifford a list of questions about the performance plan and uploaded documents, such as study rubrics and lab manuals into Canvas, as instructed by Gifford. Exh. 3, pp. 217:17 – 218:1; 225:5-7; 231:7-13. Sigstedt also worked with Martin Kollman from the College's IT department to resolve issues he was experiencing with Canvas and elevate his proficiency with the online learning platform. *Id.* at 229:17 – 230:4. Thus, there is evidence in the record that Sigstedt tried to comply with the requirements set forth in his improvement plan—the College thinks those efforts fell short, and a jury will need to resolve the parties' dispute in that regard.

In any event, Sigstedt's so-called failure to complete the performance plan did not materially detract from the benefits the College would have received had it deemed him successful. *Newcomb*, 279 P.2d at 412. Presumably, the primary benefit the College receives from its professors is their teaching service. However, the College chose not to assign Sigstedt any teaching responsibilities when he returned from his leaves of absence during the 2019-20 academic year. Even if it had, Sigstedt's performance plan ended on May 3, 2019—i.e., less than one week before the expiration of his 2019-20 contract term. Thus, had the College deemed Sigstedt successful under the performance plan and allowed him to continue teaching, it would have received the benefit of Sigstedt's service the following academic year. The reason the College did not receive the benefit of Sigstedt's service in 2020-21 is that it decided to non-renew his employment.

### B. Whether the College Performed its Contractual Obligations is a Disputed Question of Fact

As noted above, whether a party performed under a contract is a question for the fact finder to resolve. *Rohauer*, 736 P.2d at 410. The College argues that it performed its contractual obligations, insisting that (a) it paid Sigstedt the full amount due under his 2019-20 contract; (b) it was impossible for the College to provide Sigstedt with notice as required by Policy 6.26; and (c) Sigstedt "was fully aware that his employment would be terminated" if he did not successfully complete his performance plan. ECF No. 95, pp. 18-19. None of these arguments provides a convincing basis for awarding summary judgment to the College because they merely underscore the existence of factual disputes that will need to be resolved at trial.

First, although the College paid Sigstedt the salary and benefits due under his 2019-20 employment agreement, it has not paid him anything for the academic years since then. Importantly, Sigstedt was <u>not</u> an at-will employee subject to termination at any time. Rather,

12

Sigstedt was a regular full-time faculty member at the College, and that status afforded him meaningful job protections. Most pertinent here, Sigstedt's status guaranteed that he would not be non-renewed for a coming academic year unless the College notified him of non-renewal no later than 60 days before the end of his contract term. Exh. 1 (Policy 6.26). The College failed to provide timely notice in this case—it did not inform Sigstedt of his non-renewal until May 19, 2019, roughly a week-and-a-half after Sigstedt's 2019-20 contract term ended. Exhs. 7 (non-renewal notice) and 4 (2019-20 employment contract). Reasonable jurors could determine the late notice in this case was a failure to perform by the College.

Second, it was not impossible for the College to notify Sigstedt of non-renewal on or before its deadline for doing so. All it needed to do was prepare and send a letter informing Sigstedt of non-renewal at least 60 days before May 8, 2020. Alternatively, if the College believed it had ample evidence to support a dismissal, as opposed to ending Sigstedt's employment by non-renewing him, it could have notified him of that fact and given him an opportunity to challenge that basis for discharge. It did not do that, and jurors should have an opportunity to make credibility determinations in deciding whether they believe it was impossible for the College to give Sigstedt fair and timely notice of non-renewal. *United States v. Washita Constr. Co.*, 789 F.2d 809, 817 (10th Cir. 1986) (observing witnesses, appraising their credibility, determining the weight to be given their testimony, and resolving conflicts in the evidence are exclusive functions of the jury).

Third, Sigstedt was not aware that his employment would be terminated until he learned the outcome of the performance plan. Exh. 2. The performance plan notified Sigstedt of deficiencies that he needed to improve and that if he were unsuccessful in doing so, his employment would be terminated. *Id.* But the acknowledgment provision provided that Sigstedt

understood if he was not successful at completing the plan, his employment <u>may</u> be terminated. *Id.* The peer review committee charged with making a recommendation about Sigstedt's competence recognized that Sigstedt's performance plan merely put him on notice that he <u>might</u> be discharged if he did not show improvement. Exh. 6, p. 3. Thus, there is ample evidence in this case from which reasonable jurors could conclude that Sigstedt did not view his discharge as a *fait accompli*, even if the College did once it decided he had failed to complete the improvement plan.

### C.  The College's Late Notice of Non-Renewal Caused Sigstedt to Lose the Salary and Benefits He Would Have Earned the Following Academic Year

The parties do not dispute that Sigstedt received the salary and benefits due to him under his 2019-20 contract, nor that he has not received any payments from the College for any academic year since then. Once the contractual deadline for notifying Sigstedt of non-renewal passed in March 2020, the only way for the College to terminate Sigstedt's employment prior to the beginning of the 2020-21 academic year would have been to "dismiss" him pursuant to Policy 6.26. The College did not do that, but now insists that it could have. ECF No. 95, pp. 20-21.

Whether the College's evidence against Sigstedt was sufficient to support a dismissal is a disputed question of fact. To the College, its evidence seems overwhelming, but jurors might look unfavorably on the facts that, for example: (a) Gifford only observed Sigstedt teach one time; (b) Sigstedt did not have an opportunity to teach past November 2019; and (c) in the end, the College's assessment of Sigstedt's teaching amounted to little more than seeing how well he could upload materials related to his courses onto the Canvas system. Jurors might also reasonably question why the College afforded so much weight to the small number of students

14

who complained about Sigstedt when the overwhelming majority of his students rated him so favorably.  Exh. 11 (course evaluations) (including student comments describing Sigstedt as a "[g]reat professor" and "excellent teacher" (p. 000570)).

In short, the College's late decision to non-renew Sigstedt's employment deprived him of salary and benefits for the 2020-21 academic year, at a minimum.  And whether the College could have dismissed Sigstedt prior to the beginning of 2020-21 is a fact question for the jury. Consequently, summary judgment for the College would be inappropriate.

## III.    Violation of Due Process

The individual defendants are not entitled to qualified immunity in this case because they violated Sigstedt's clearly established constitutional right to due process.  Additionally, the minimal pre-deprivation due process the defendants afforded Sigstedt was insufficient to satisfy due process standards in light of the lack of any available post-deprivation due process.  Because reasonable jurors could find in Sigstedt's favor on his due process claim, summary judgment for the defendants would be inappropriate.

### A.  The Doctrine of Qualified Immunity Does Not Shield the Individual Defendants from Liability in this Case

The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Mullenix v. Luna*, 577 U.S. 305, 308 (2015).  The doctrine balances the important interests of needing to hold public officials accountable when they exercise power irresponsibly and shielding officials from harassment, distraction, and liability when they perform their duties reasonably.  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  When a defendant invokes qualified immunity, the plaintiff must show that (1) the

defendant violated a constitutional or statutory right; and (2) the right was clearly established at

the time of the defendant's challenged conduct. *Id.* at 232; *see also Estate of Valverde v. Dodge*,

967 F.3d 1049, 1058 (10th Cir. 2020).

As a regular, full-time faculty member with "just cause" job protection, Sigstedt

possessed a property interest deserving of procedural due process protections. *Brenna v.

Southern Colo. State College*, 589 F.2d 475, 476 (10th Cir. 1978); *see also Bd. of Regents v.

Roth*, 408 U.S. 564, 576-77 (1972); *Lentsch v. Marshall*, 741 F.2d 301, 305 (10th Cir. 1984)

(contract or ordinance, for example, may create a property interest in employment).  Due process

is flexible and calls for such procedural protections as a particular situation demands.  *Lentsch*, at

305.  "At a minimum, however, due process requires that the discharged employee receive

adequate notice of the reasons for the termination and a meaningful opportunity to rebut the

charges."  *Id.*  The individual defendants in this case fell short on both fronts.

President Hauser delegated to Gianneschi the responsibility for making decisions about

Sigstedt's non-renewal.  Exh. 12, p. 60:8-21.  Gianneschi, in turn, relied on Gifford to manage

the implementation of Sigstedt's performance plan and to decide whether Sigstedt passed or

failed the plan.  Exh. 8, pp. 44:25 – 45:15.  Gifford decided in May 2020 that Sigstedt failed the

performance plan and Gianneschi—acting on authority delegated to him from Hauser—decided

to non-renew Sigstedt's employment and informed him of that fact on May 19, 2020.  Exh. 12.

In so doing, Gianneschi either disregarded or failed to recognize the College's deadline for

notifying employees of non-renewal inasmuch as he notified Sigstedt of his non-renewal more

than two months late.

Additionally, whereas Gianneschi initially informed Sigstedt that he was being non-

renewed due to alleged incompetence, the College now insists there was another reason to fire

him—i.e., poor performance.  In *Lentsch*, 741 F.2d at 306, the Tenth Circuit held an employee did not receive the adequate notice that due process required when the notice gave one reason for discharge and the employer later insisted there were other reasons for firing her.  Similarly, in this case Gianneschi led Sigstedt to believe he was being non-renewed because the College no longer believed he was able to carry out the duties of a competent professor; now, however, the defendants argue Sigstedt's discharge had less to do with his <u>ability</u> to teach than with his <u>level of proficiency</u> at teaching.  In the end, Sigstedt is left guessing about the real reason(s) why the defendants decided to terminate his employment.

Moreover, Gifford and Gianneschi—again, acting on authority from Hauser—took responsibility for presenting the College's case against Sigstedt and actively lobbied to deprive him of a <u>meaningful</u> opportunity to be heard.  True enough, the parties participated in a peer review hearing, where each would purportedly be given an opportunity to present its case regarding the issues surrounding Sigstedt's non-renewal.  After about one hour and twenty minutes, the peer review committee called the hearing to an end.  Sigstedt asked for more time at a later date because he had hardly scratched the surface of his case, but Gianneschi insisted there was no need to continue the hearing.  Instead, Gianneschi insisted, the peer review committee could refer to documents submitted by both sides in rendering a decision about Sigstedt's competence.  However, an adequate hearing would have included, for example, the right to cross-examine adverse witnesses.  *Workman v. Jordan*, 32 F.3d 475, 480 (10th Cir. 1994).  Sigstedt was never afforded that right and, as the individual defendants knew—or should have known—a paper review by a peer review committee is a far cry from live testimony with an opportunity for full cross-examination.

17

The individual defendants' attempt to sidestep accountability by arguing the peer review committee was the real decisionmaker in Sigstedt's non-renewal is unconvincing.  The peer review committee was merely a reviewing body charged with making a recommendation to President Hauser regarding whether the College adequately supported its decision to non-renew Sigstedt's employment.  Exh. 5 (Procedure 6-I).  As noted above, Gifford decided that Sigstedt failed the performance plan; Gianneschi decided to non-renew Sigstedt's employment; and Hauser made the final decision to terminate Sigstedt's employment when she "substantially agreed" with the peer review panel's recommendation.

### B.  Sigstedt Received Inadequate Pre- and Post-Termination Due Process

The College characterizes everything that went in to Sigstedt's performance plan as pre-termination process.  *See* ECF No. 95, pp. 23-25.  However, up until May 19, 2019, the College had never informed Sigstedt that he <u>would</u> be dismissed or non-renewed, nor upon what basis his employment would be terminated.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) (pre-termination process involves notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to present his side of the story).  Rather, during the entire 2019-20 academic year, Sigstedt was merely on notice that he <u>might</u> be fired if his teaching performance did not improve to the College's satisfaction.

The pre-termination process that the College afforded Sigstedt started on May 19, 2020— i.e., when Gianneschi formally informed Sigstedt of the College's decision to non-renew his employment.  From there, the procedure unfolded as provided by Policy 6.26 and Procedure 6-I. During the pre-termination hearing, however, the College deprived Sigstedt of a meaningful opportunity to be heard by ending the proceeding after about one hour and twenty minutes, when Sigstedt had just begun challenging the College's attack on his competence.  The procedure

18

allowed Sigstedt the benefit of "advisory" legal counsel but did not afford him the opportunity to call witnesses or cross examine witnesses called by the College.  Exh. 5.  Indeed, the College did not call any witnesses for Sigstedt to cross-examine.

In some instances, the above-described pre-termination process might be sufficient if there were adequate post-termination procedures in place.  *Langley v. Adams County Colo.*, 987 F.2d 1473; 1480 (10th Cir. 1993) ("Under *Loudermill*, the adequacy of pre-termination procedures must be examined in light of available post-termination procedures.").  In *Loudermill*, state statute afforded the discharged employee with a full post-termination administrative hearing.  470 U.S. at 546-47.  Here, however, Sigstedt received no post-termination due process at all.  After the peer review committee ended his pre-termination hearing prematurely, President Hauser issued a decision agreeing with the committee's recommendation to non-renew Sigstedt's employment.  College procedure prevented Sigstedt from appealing to the Board of Trustees, and there was no state law or other authority affording him the right to a full hearing where he could challenge the College's decision to end his employment.

In light of the lack of any post-termination due process, the Court should scrutinize even more carefully the very limited pre-deprivation process that Sigstedt received.  *Loudermill*, at 547.  The College afforded Sigstedt less than an hour-and-a-half to save his job, but without the benefit of being allowed to call witness or challenge in any meaningful way the College's evidence against him.  Although the peer review committee deliberated after the hearing, it did not allow Sigstedt to finish making his case for why the committee should have rejected the College's assertion that he was incompetent.  In short, reasonable jurors could conclude the College failed to afford Sigstedt a meaningful opportunity to save his career.

19

In depriving Sigstedt of that opportunity, College officials were following the course set for them by Policy 6.26 and Procedure 6-I.  *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (municipal liability attaches when plaintiff demonstrates the existence of a formal regulation or policy statement as well as a causal link between the policy and the injury alleged).  Consequently, the link between those official policy statements and the deprivation in this case is clear, unbroken, and direct.

## CONCLUSION

WHEREFORE, the Plaintiff, Shawn Sigstedt, respectfully requests that the Court deny the Defendants' motion for summary judgment in its entirety.

DATED this 11th day of February 2022.

Respectfully submitted,

s/ *Erik G. Bradberry*
Erik G. Bradberry
Colorado Education Association
1500 Grant Street
Denver, CO 80203
(303) 837-1500
Fax: (303) 861-2039
ebradberry@coloradoea.org

20

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of February 2022, a true and correct copy of the foregoing **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was electronically filed via was electronically filed via the CM/ECF E-Filing system with service requested as follows:

Jacqueline Guesno, Esq.
Jackson Lewis, P.C.
950 17th Street
Suite 2600
Denver, CO 80202

s/ *Joanne Soklin*
Joanne Soklin, Paralegal